{¶ 16} I disagree. At the bare minimum, the extrinsic evidence suggests a genuine issue of material fact on the issue of an informed rejection of UM/UIM coverage by Evans. In fact, I'd conclude from all the extrinsic evidence, that there is no genuine issue and would grant summary judgment in favor of Cincinnati.
 {¶ 17} It is uncontraverted from Evans' own deposition that at the time she rejected UM/UIM coverage, she had worked in the insurance industry for over seventeen years. Evans had, in fact, sold insurance to clients, answered questions about coverage, explained coverage and handled renewals for automobiles. She had been licensed to sell insurance since 1983, a license that permitted her to sell both property and casualty insurance. Her license was always in good standing since she completed twenty hours of educational requirements every two years. Evans acknowledged that while at Baldwin Whitney she marketed auto policies including UM/UIM coverage.
 {¶ 18} More specifically, Evans admitted dealing consistently with package policies issued by Cincinnati Insurance Agency. She admitted serving VIP customers' package policies, which include automotive as well as homeowners. In fact, Evans acknowledged ten percent of her VIP customers were with Cincinnati Insurance.
 {¶ 19} It strains credulity to suggest someone who has spent their entire career in the insurance industry did not understand her own rejection of UM/UIM coverage. Notably, Evans, at the time of rejection of UM/UIM coverage, was a licensed agent with the Cincinnati Insurance Agency, per the deposition of her own subordinate, Terri Young.
 {¶ 20} As noted in Hollon and recognized by the majority, the Linko requirements are a means to an end. They were chosen to ensure that insurers make meaningful offers. A "meaningful offer" is an offer that is "an offer in substance and not just in name" that allows an insured to make an express, knowing rejection of UM/UIM coverage." Despite the fact that Cincinnati, through Evans' own subordinate, Terri Young, did not satisfy in writing all the Linko requirements, I would not elevate form over substance. I cannot ignore Evans' educated express intent to reject coverage. This is, after all, coverage that she herself sold, marketed and explained to others. As a member of Insurance Women of Dayton and the Professional Insurance Association, she clearly possessed an expertise the ordinary consumer may lack.
 {¶ 21} Finally, and perhaps most compelling, is the fact that Evans was a shareholder in Baldwin Whitney at the time she rejected UM/UIM coverage. And because she was Vice President, the company paid for her umbrella coverage (i.e., UM/UIM). Notably, this exchange reveals perhaps her true motivation in rejection of UM/UIM:
 {¶ 22} "Q. I presume that since Baldwin Whitney was paying for this coverage, that premiums for the umbrella were really not a concern you had?
 {¶ 23} "A. Yes, they were.
 {¶ 24} "Q. Why were they a concern?
 {¶ 25} "A. I was concerned about premiums because it came out of the agency's pocket and I'm part owner of the agency. So you're still concerned about premiums."
 {¶ 26} I would find the signed rejection form and extrinsic evidence establish a meaningful offer and valid rejection of UM/UIM coverage. Evans' "claim" of confusion does not establish a GENUINE issue of material fact in my view. I would reverse.